## NO. 22-4544

In The

# United States Court Of Appeals
## For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## BRENT BREWBAKER,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
AT RALEIGH**

————————

## BRIEF OF APPELLANT

————————

Elliot S. Abrams
CHESHIRE, PARKER,
  SCHNEIDER, PLLC
133 Fayetteville Street
Suite 400
Raleigh, NC 27601
(919) 833-3114

*Counsel for Appellant*

## TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF JURISDICTION ......................................................... 1

STATEMENT OF THE ISSUES ............................................................. 1

STATEMENT OF THE CASE ................................................................. 3

SUMMARY OF ARGUMENT ............................................................... 12

STANDARD OF REVIEW.................................................................... 19

ARGUMENT ....................................................................................... 19

    I.    THE DISTRICT COURT REVERSIBLY ERRED IN DETERMINING THAT THE *PER SE* RULE APPLIED TO THE SHERMAN ACT CHARGE .................................. 19

        A.    The district court erred in determining that the Indictment did not allege a "dual distribution" arrangement, despite unrebutted economic analysis to the contrary ............................................... 20

            i.    Dual distribution arrangements are not *per se* violations, and, before applying the *per se* rule to an alleged agreement between vertically related entities, the district court must conduct an evidentiary inquiry to determine the purpose of the agreement ........... 20

           ii.    The district court erred in determining that the face of the Indictment did not allege a dual distribution arrangement ............................ 36

iii.    The district court erred by refusing to consider Professor Elzinga's affidavit before deciding to reject the defendants' plausible procompetitive justification ................................ 40

B.    The district court reversibly erred by finding that the face of the Indictment alleged a *per se* violation ........................................................................ 45

C.    The district court erred by applying the *per se* rule to this criminal case because the *per se* rule either constitutes an unconstitutional conclusive presumption or unconstitutionally alters the elements of the offense ................................................ 49

II.    SECTION 1 IS UNCONSTITUTIONALLY VAGUE AS APPLIED ........................................................................ 54

A.    Section 1 is unconstitutionally vague as applied to this and any criminal prosecution because it literally criminalizes all economic activity and leaves it to law enforcement, judges, and juries to decide what conduct is criminal ................................ 54

B.    There are insufficient statutory standards regarding what constitutes a *per se* bid rigging violation ........................................................................ 56

C.    Section 1 is unconstitutional as applied to conduct that enhanced competition ............................ 59

D.    *Nash* does not control .................................................... 60

III.    THE COURT DIRECTED VERDICT ON TWO ESSENTIAL ELEMENTS OF THE § 1 OFFENSE ............ 62

IV.    THE MAIL AND WIRE FRAUD CONVICTIONS MUST BE VACATED ............................................................ 63

CONCLUSION ....................................................................... 64

STATEMENT REGARDING ORAL ARGUMENT ............................... 65

CERTIFICATE OF COMPLIANCE........................................................ 66

# TABLE OF AUTHORITIES

**Pages(s):**

**Cases:**

*Apex Hosiery Co. v. Leader*,
    310 U.S. 469 (1940) ........................................................ 2, 21, 55

*Arizona v. Maricopa Cnty. Med. Soc'y*,
    457 U.S. 332 (1982) ............................................................ *passim*

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ....................................................................... 22

*Cal. Dental Ass'n v. FTC*,
    526 U.S. 756 (1999) ............................................................ *passim*

*Care Heating & Cooling, Inc. v. Am. Stand., Inc.*,
    427 F.3d 1008 (6th Cir. 2005) ..................................................... 25

*Chapman v. California*,
    386 U.S. 18 (1967) ................................................................. 39-40

*Connecticut v. Johnson*,
    460 U.S. 73 (1983) ....................................................................... 63

*Cont'l Airlines, Inc. v. United Airlines, Inc.*,
    27 F.3d 499 (4th Cir. 2002) ......................................................... 21

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ................................................. 20, 49

*Donald B. Rice Tire Co. v. Michelin Tire Corp.*,
    638 F.2d 15 (4th Cir. 1981) ................................................ *passim*

*Dr. Miles Med. Co. v. John D. Park & Sons Co.*,
    220 U.S. 373 (1911) ..................................................................... 57

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ....................................................... 34

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*,
    129 F.3d 240 (2d Cir. 1997)..................................... 28, 36

*Expert Masonry, Inc. v. Boone Cnty.*,
    440 F.3d 336 (6th Cir. 2006) .......................................... 24

*Francis v. Franklin*,
    471 U.S. 307 (1985) ....................................................... 50

*FTC v. Indiana Fed'n of Dentists*,
    476 U.S. 477 (1986) ....................................................... 31

*FTC v. Superior Ct. Trial Laws. Ass'n*,
    493 U.S. 411 (1990) ....................................................... 53

*Hernandez v. Mesa*,
    140 S. Ct. 735 (2020) ..................................................... 55

*Holmes v. South Carolina*,
    547 U.S. 319 (2006) ....................................................... 50

*In re Se. Milk Antitrust Litig.*,
    739 F.3d 262 (6th Cir. 2014) ............................. 24, 31, 39

*In re Sulfuric Acid Antitrust Litig.*,
    703 F.3d 1004 (7th Cir. 2012) ....................................... 29

*Johnson v. United States*,
    574 U.S. 591 (2015) ....................................................... 21

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ............................................... *passim*

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ("*Leegin I*")............................. *passim*

*Liparota v. United States*,
    471 U.S. 419 (1985) ............................................................ 52, 53

*Lumber Liquidators, Inc. v. Cabinets To Go, LLC*,
    415 F. Supp. 3d 703 (E.D. Va. 2019)................................. 29, 31, 48

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ............................................................ 35, 44

*Med. Ctr. At Elizabeth Place, LLC v.*
*Atrium Health Sys. ("Elizabeth Place")*,
    922 F.3d 713 (6th Cir. 2019) .............................................. *passim*

*Med. Ctr. At Elizabeth Place LLC v. Premier Health Partners*,
    No. 3:12-CV-26, 2012 WL 3776444
    (S.D. Ohio Aug. 30, 2012) .................................................... 30

*Nash v. United States*,
    229 U.S. 373 (1913) .......................................................... *passim*

*NCAA v. Alston*,
    141 S. Ct. 2141 (2021) ........................................................ 30

*NCAA v. Bd. of Regents of Univ. of Oklahoma*,
    468 U.S. 85 (1984) ............................................................ *passim*

*N.C. State Bd. of Dental Exam'rs v. FTC*,
    717 F.3d 359 (4th Cir. 2013) .............................................. 20

*Neder v. United States*,
    527 U.S. 1 (1999) ............................................................... 62

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ..................................... 22, 25, 34, 51

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
    776 F.2d 185 (7th Cir. 1985) .............................................. 29, 38, 48

*Polygram Holding, Inc. v. FTC*,
    416 F.3d 29 (D.C. Cir. 2005) .............................................. 34

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
   615 F.3d 412 (5th Cir. 2010) ("*Leegin II*")........................ 28, 36, 48

*Ratino v. Med. Serv. of D.C. (Blue Shield)*,
   718 F.2d 1260 (4th Cir. 1983) ..................................................... 22

*RZS Holdings AVV v. PDVSA Petroleo S.A.*,
   506 F.3d 350 (4th Cir. 2007) ................................................. 33, 42

*Sessions v. Dimaya*,
   138 S. Ct. 1204 (2018) ........................................................... 54, 59

*Sorich v. United States*,
   555 U.S. 1204 (2009) ................................................................... 55

*Standard Oil Co. v. United States*,
   221 U.S. 1 (1911) ................................................................... 20, 55

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
   988 F.3d 690 (4th Cir. 2021) ...................................................... 27

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006) ................................................................... 24, 47

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015).......................................................... 9

*United States v. Bishop*,
   740 F.3d 927 (4th Cir. 2014) .................................................. 52, 53

*United States v. eBay, Inc.*,
   968 F. Supp. 2d 1030 (N.D. Cal. 2013) ................................... 31, 32

*United States v. Fenzl*,
   670 F.3d 778 (7th Cir. 2012) ............................................ 47, 49, 56

*United States v. Gosselin World-Wide Moving, N.V.*,
   411 F.3d 502 (4th Cir. 2005) .............................................. 47, 56

*United States v. Heffernan,*
  43 F.3d 1144 (7th Cir. 1994) ........................................56

*United States v. Hudson,*
  11 U.S. 32 (1812) ............................................ 52, 53, 55

*United States v. Koppers Co.,*
  652 F.2d 290 (2d Cir. 1981)........................... 37, 38, 39, 43

*United States v. L. Cohen Grocery Co.,*
  255 U.S. 81 (1921) ........................................................55

*United States v. Lindberg,*
  39 F.4th 151 (4th Cir. 2022)............................... 19, 50, 63

*United States v. Malloy,*
  568 F.3d 166 (4th Cir. 2009) ........................................ 19

*United States v. Patten,*
  226 U.S. 525 (1913) ...............................................27, 48

*United States v. Portsmouth Paving Corp.,*
  694 F.2d 312 (4th Cir. 1982) ........................................57

*United States v. Realty Multi-List, Inc.,*
  629 F.2d 1351 (5th Cir. 1980) ...................................... 19

*United States v. Reese,*
  92 U.S. 214 (1875) ...............................................53, 54

*United States v. Robel,*
  389 U.S. 258 (1967) .....................................................60

*United States v. Rogers,*
  18 F.3d 265 (4th Cir. 1994) ..........................................62

*United States v. Topco Assocs., Inc.,*
  405 U.S. 596 (1972) .....................................................23

*United States v. U.S. Gypsum Co.*,
    438 U.S. 442 (1978) ........................................................ 21, 22, 49

*United States v. W.F. Brinkley & Son Const. Co. ("Brinkley")*,
    783 F.2d 1157 (4th Cir. 1986) ....................................22-23, 41, 42

*Valuepest.com of Charlotte, Inc. v. Bayer Corp.*,
    561 F.3d 282 (4th Cir. 2009) ..................................................20-21

**Statutes:**

15 U.S.C. § 1 ....................................................................... *passim*

15 U.S.C. §§ 1-38 (Sherman Act) ................................................ *passim*

18 U.S.C. § 3231 ............................................................................ 1

28 U.S.C. § 1291 ............................................................................ 1

**Constitutional Provisions:**

U.S. Const. amend. V ............................................................ *passim*

U.S. Const. amend VI............................................................. *passim*

**Sentencing Guidelines:**

U.S.S.G. § 2B1.1 ........................................................................ 12

U.S.S.G. § 2R1.1 ........................................................................ 12

**Rules:**

Fed. R. Crim. P. 12(b)(1) ............................................................ 8

Fed. R. Crim. P. 12(b)(3)(B)(v) .................................................. 8

**Other Authorities:**

Phillip Areeda,
Antitrust Law (1986) ............................................................. 58

Phillip E. Areeda,
Antitrust Law (3d ed. 2007) ................................................. 32

The Federalist No. 78 ............................................................. 54

William E. Kovacic,
*The Future Adaptation of the Per Se Rule of Illegality in U.S.
Antitrust Law*, 2021 Colum. Bus. L. Rev. 33 (2021) ......................... 34, 55

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this case under 18 U.S.C. § 3231. This is a direct appeal from a final judgment of the United States District Court for the Eastern District of North Carolina entering judgment of conviction and imposing a criminal sentence. The district court entered written judgment on September 12, 2022, and Mr. Brewbaker timely filed notice of appeal on September 22, 2022. JA41. This Court's jurisdiction is secured by 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    The Sherman Act *per se* rule applies only if the alleged agreement clearly and unquestionably warrants *per se* treatment. There is no bright line separating *per se* and rule of reason analysis, and a court often must conduct economic analysis before applying the *per se* rule. Did the district court erroneously apply the *per se* rule either:

> (a)    because the district court refused to apply the *per se* rule by finding that the alleged agreement between a manufacturer and distributor was not a "dual distribution" arrangement, despite unrebutted economic evidence establishing otherwise;

1

(b)    because the district court determined that the face of the Indictment alleged a *per se* violation even though the Indictment did not allege that the parties to the alleged agreement were "competitors"; or

(c)    because the *per se* rule creates a "conclusive presumption" that the statutory elements of unreasonableness and criminal intent are met, and the Supreme Court has held that conclusive presumptions are unconstitutional in criminal cases?

2.    A criminal statute is unconstitutionally vague if it "set[s] a net large enough to catch all possible offenders, and leave[s] it to the courts to step inside and say who could be rightfully detained." *Kolender v. Lawson*, 461 U.S. 352, 358 n.7 (1983). The Court recognizes that 15 U.S.C. § 1 literally criminalizes every contract, so, "[i]n consequence of the vagueness of its language …, the courts have been left to give content to [§ 1]." *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 489 (1940). Is § 1 of the Sherman Act unconstitutionally vague as applied either:

(a)    because it literally criminalizes every contract and leaves it to the court to determine which contracts are criminal;

2

(b)    because there are insufficient statutory standards defining the purported offense of bid rigging; and/or

(c)    because this prosecution criminalized conduct that enhanced competition?

3.    A valid conviction requires a jury determination that the prosecution established every element of the offense beyond a reasonable doubt. The elements of a criminal violation of § 1 are (1) an agreement (2) to impose an unreasonable restraint of trade (3) knowing that the conduct would unduly suppress competition. Is the § 1 conviction valid when the jury did not decide elements 2 or 3?

4.    The prosecution's fraud theory was that the purpose of the fraud was to conceal the alleged § 1 offense. Can the government prove that the district court's error(s) with respect to the § 1 charge did not play any role in the jury's consideration of the fraud charges?

## STATEMENT OF THE CASE

Appellant Brent Brewbaker worked for Contech Engineered Solutions, LLC. JA190. Contech is a manufacturer of aluminum pipes and structures. JA1845. Since 1988, Contech has been in an exclusive distributor partnership with Pomona Pipe Products, Inc. JA1885,

3

JA1914, JA2035, JA2158. The partnership was so close that, starting in the 1990s, a Contech employee worked at Pomona's offices. JA1915-1916. The President of Pomona (who the government called as a witness) testified that he did not view Contech as a "competitor." JA1914. The main competitor of the Contech-Pomona partnership was Lane Enterprises, Inc. JA125, JA1854-1855.

One type of project that Contech and Pomona partnered on was aluminum stormwater culverts under roads in North Carolina. JA2158. Pomona, Contech, and Lane all typically bid for contracts with the North Carolina Department of Transportation ("NCDOT") to provide the material and installation for these stormwater culverts. JA1930. The face of Pomona's bid noted that, if it won the bid, it would source the aluminum from Contech, JA1792, and NCDOT was aware that Contech and Pomona had a business relationship, JA1786.

If Contech won the bids, it would subcontract Pomona to manage the project. JA1929, JA1932, JA2143-2144. Therefore, before bidding, Mr. Brewbaker would obtain or cause an employee to obtain Pomona's price for installing the culvert. JA2143-2144. This price was typically the same price as Pomona's bid price. *See* JA2009. Contech would add

to this price to account for certain administrative costs before submitting its bid. *See* JA1891, 1996. Contech's bids were, therefore, always higher than Pomona's bids. JA1826-1827. The reason that Contech submitted bids was (1) to ensure that, if Pomona's bid were disqualified, the Contech-Pomona partnership would still have an opportunity to defeat its competitor's (Lane's) bid; and (2) to ensure that Contech was on the NCDOT list for getting emergency contracts. JA1826, JA2084. Importantly, NCDOT did not require a minimum numbers of bids, JA1784, and nothing about Contech's bids affected Pomona's bids or the ultimate price that NCDOT paid for the work, JA1794-1795, JA2086.

On October 20, 2020, the government obtained a six-count indictment charging Contech and Mr. Brewbaker with a Sherman Act, 15 U.S.C. § 1, violation, as well as five fraud counts.

The § 1 charge alleged that Contech was a "manufacturer" of aluminum pipes used for structure projects. JA45. It further alleged that, starting "before 2009" until June 2018, Pomona[1] was Contech's distributor or "dealer" and that, "[a]s part of that relationship," Contech

---

[1] Pomona was referred to in the Indictment as Company A. The identity of Company A as Pomona was revealed at trial. JA1809.

"regularly sold aluminum" to Pomona to "use[] … to complete work on behalf of NCDOT, including for aluminum structure projects." JA46. It alleged that from at least 2009 through June 2018, Contech and Pomona had an agreement under which Contech would submit to NCDOT an "intentionally higher bid" than Pomona's bid for aluminum structure contracts. JA48. And it alleged that, in so doing, Mr. Brewbaker, Contech, and Pomona engaged in a conspiracy to "knowingly … suppress and eliminate competition by rigging bids to NCDOT for aluminum structure projects," which was alleged to be "a *per se* unlawful, and thus unreasonable, restraint of interstate … commerce in violation of [§ 1]." JA50. Notably, the Indictment did not allege that Contech and Pomona were "competitors." JA44-62.

The fraud counts (Counts Two through Six) generally alleged that, when submitting bids, Contech and Mr. Brewbaker caused to be submitted a certification to NCDOT that the bid was "submitted competitively and without collusion," when the defendants "knew they had colluded" with Pomona because Contech's bid was "intentionally higher" than Pomona's bid. JA55-56. Count Two charged a fraud conspiracy, and Counts Three through Six charged execution of that

6

conspiracy on four identified dates. JA52-59. After hearing the trial evidence, the district court concluded that the fraud theory was that "fraud was a means to an end: concealing the bid-rigging." JA2677-2678.

In response to the Sherman Act charge seeking application of the *per se* rule, as opposed to the "rule of reason," Contech filed a motion to have the district court apply the rule of reason. JA63-99. Mr. Brewbaker joined that motion, JA615-624, JA1341.

In support of their motion to apply the rule of reason, the defendants provided an affidavit of Professor Kenneth G. Elzinga, Robert C. Taylor Professor of Economics at the University of Virginia. JA102-147. Professor Elzinga is the former Antitrust Division economic advisor to the Assistant Attorney General. JA105. The Supreme Court has relied on his economic analysis in at least three antitrust cases, most recently in *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ("*Leegin I*"), in which the Supreme Court accepted Professor Elzinga's analysis to overturn precedent and hold that the rule of reason applies to vertical price fixing. JA88, JA105.

Professor Elzinga's forty-four-page affidavit applied economic principles to the allegations in the Indictment and concluded that the

alleged anticompetitive conduct actually enhanced competition. *See* JA108, JA146. Specifically, he concluded that the alleged conduct was the "model of [a] dual distribution [arrangement], whereby a manufacturer and its distributor both [sell] the manufacturer's products" directly to customers. JA108. And he explained that "[p]rice coordination in [such] a dual distribution [arrangement] is recognized to be procompetitive" and "is common[.]" *Id.*

The government did not submit any evidence to counter Professor Elzinga's conclusions. JA589-614, JA949-961.

In deciding the motion, the district court acknowledged that "the conduct may allegedly be procompetitive," JA974, and that the Indictment alleged a "manufacturer-distributor relationship" that included sales related to the NCDOT projects at issue, *see* JA46, JA979. It also recognized that vertical arrangements do not warrant *per se* treatment. JA981. The district court noted that the proper procedural process for considering the motion was "far from clear." JA967. The district court did not hold a hearing. JA962. Even though the motion was made under Federal Rule of Criminal Procedure 12(b)(1), which allows for supporting affidavits, JA964-965, the district court deemed the motion a motion to dismiss under Rule 12(b)(3)(B)(v), "consider[ed] only

8

the indictment," and declined to consider Professor Elzinga's affidavit or any other information.  JA974.

While purporting to consider only the Indictment, the district court "inferred" an allegation that was not included therein—that is, that Contech and Pomona were "competitors."  *See* JA973 ("[T]he indictment alleges facts *permitting an inference* that defendant Contech … engaged in an 'agreement between competitors[.]'" (emphasis added)).  And the district court ruled that co-bidders are necessarily horizontal competitors.  JA979.

The district court then turned to the defendants' argument the Indictment alleged a "dual distribution" arrangement, which courts uniformly analyze under the rule of reason.  JA980, JA982.  The district court recognized that Fourth Circuit precedent requires that the orientation of an arrangement be determined on a "case-by-case basis." JA982 (citing *Donald B. Rice Tire Co. v. Michelin Tire Corp.*, 638 F.2d 15, 16 (4th Cir. 1981) (per curiam)).  It also noted that "determining the orientation of an agreement … [is] a matter of fact."  JA983 (quoting *United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015)). Nonetheless, the court limited its review of the face of the Indictment. JA974.

9

Then, without citation to the record or the Indictment, the district court ruled that "[a]ny vertical relationship, here, only intersected with and gave rise to the horizontal arrangement at issue, the actual bid-rigging agreement." JA984-985. And it wrote, in a footnote, that the term "dual distribution … typically refer[s] to distribution of the same product whereas here defendant Contech sells aluminum products to a distributor and then submits intentionally losing bids on aluminum product installation projects." JA983. The court did not provide economic analysis or cite any case law suggesting that this distinction matters from an economic standpoint. *See id*. Nor did the court address the fact that the only economic evidence before the court, Professor Elzinga's affidavit, contradicted the court's observation. *See* JA115.

On these grounds, the district court denied the defendants' motion to apply the rule of reason. JA985.

Mr. Brewbaker later filed a motion to dismiss the Sherman Act charge under the Fifth Amendment, challenging the charge on unconstitutional vagueness grounds and re-raising many of the same arguments presented in support of his motion to apply the rule of reason. JA1070, JA1341. The district court denied this motion as well. JA1342.

Trial began on January 25, 2022. JA1702. After argument, the court instructed the jury on the Sherman Act charge, *inter alia*, as follows:

- "The Sherman act makes unlawful certain agreements that, because of their harmful effect on competition, are an unreasonable restraint on trade and always illegal." JA2592.

- "If there was, in fact, a conspiracy as charged in Count One of the indictment, it was illegal." JA2593.

- "[Y]ou need not be concerned with whether the agreement was reasonable or unreasonable, the justifications for the agreement, or the harm, if any, done by it." *Id.*

- "The good faith of a defendant is not a defense to … Count One …. [I]t is not a defense that those involved may have acted with good motives, or may have thought that what they were doing was legal, or that the conspiracy may have had some good results." *Id.*

- "Bid rigging is defined as … [a]ny agreement between competitors pursuant to which contract offers are to be submitted to or withheld from a third party." JA2597.

- If the conspiracy charged in Count One … is proved, it is no defense … that the conspirators did not attempt to *collude* with all of their competitors." JA2597-2598 (emphasis added).

During deliberation, the jury asked for a definition of the term "collusion." JA2645. (Recall that the fraud charges turned on whether the certification to NCDOT that Contech's bids were submitted "competitively and without collusion." JA45). The court instructed the jury,

11

> There isn't a legally defined explanation of collusion of which this Court is aware. So in answering your question, I remind you to consider all the facts and circumstances in evidence in reaching your understanding of the crime charged, and consider all of the Court's instructions as a whole as you continue in your deliberations.

JA2645.

After deliberating for a day and a half, the jury returned guilty verdicts as to each count. JA1688-1689.

At sentencing, the district court determined, over the government's objection, that, despite the fraud counts, the case was "a bid rigging case," JA2697, and, therefore, applied the "Bid-Rigging, Price-Fixing or Market-Allocation Agreements Among Competitors" guideline (§ 2R1.1) to each of the counts, as opposed to applying the fraud guideline (§ 2B1.1) to the fraud counts. JA2677-2678. The district court determined that the applicable guideline range was 33 to 41 months, JA2678, and it varied downward, imposing a custodial sentence of 18 months. *Id*.

Mr. Brewbaker timely appealed. JA2663, JA2682.

## SUMMARY OF ARGUMENT

The district court committed three legal errors, which tainted the jury's verdicts on all counts.

I.    The district court reversibly erred in its orders determining that the *per se* rule applies to the Sherman Act Section 1 charge (Count One) in four respects.

First, the district court reversibly erred by concluding that the *per se* rule applied to the "dual distribution" arrangement alleged on the face of the Indictment.  A dual distribution arrangement exists where the distributor and manufacturer also compete at the distribution level.  The Indictment alleged that Contech was a manufacturer and its alleged co-conspirator, Pomona, was Contech's distributor.  It further alleged that the NCDOT projects at issue were part of this manufacturer-distributor relationship.  And it alleged that Contech and Pomona, while having a manufacturer-dealer relationship with respect to NCDOT work, also both submitted contract offers for this NCDOT work.  Thus, the face of the Indictment alleged a dual distribution arrangement.  Courts uniformly apply the rule of reason to price agreements between the manufacturer and the distributor in dual distribution arrangements.  And courts can apply the *per se* rule only when a restraint clearly and unquestionably warrants *per se* treatment, which dual distribution arrangements do not.

13

Second, the district court reversibly erred by relying on the government's unsupported allegations alone in deciding the factual questions necessary to apply the *per se* rule to the plausibly procompetitive, vertical arrangement alleged in the § 1 charge. Under binding precedent, a district court faced with a potential vertical agreement must decide whether the purpose of the agreement was to enhance or undermine competition before deciding whether to apply the "rule of reason" or the *per se* rule. Here, the district court noted that "the proper procedural vehicle" for deciding between the *per se* rule and the rule of reason was "far from clear," JA965, JA967; that vertical agreements are subject to the rule of reason, JA981; and that "determining the orientation of an agreement can be difficult as a matter of fact," JA983. It then elected not to hold a hearing or consider the record evidence, which showed that the purpose of the agreement was to enhance competition, before deciding this "factual matter." *See* JA102-188. Instead, the district court "consider[ed] only the indictment." JA968. Thus, the district court effectively relied on an *ex parte* presentation to make a critical factual finding that resulted in the government obtaining a "trump card" in the case. Doing so violated Mr. Brewbaker's due process rights.

14

Third, the district court reversibly erred by applying the *per se* rule and/or by refusing to dismiss the § 1 charge where the Indictment did not allege that Contech and Pomona were "competitors" and, instead, alleged that the conduct in question was ancillary to a "manufacturer"-"dealer" "relationship."     JA46; *cf.* JA973 ("[T]he indictment alleges facts *permitting an inference* that defendant Contech engaged in an 'agreement between competitors[.]'") (emphasis added)).   The *per se* rule only applies to unmistakable naked horizontal price fixing between competitors, but the Indictment identified an agreement between vertical entities engaged in a collaborative venture.   Accordingly, the district court erred by applying the *per se* rule and, to the extent that a *per se* § 1 offense is a separate offense from a § 1 rule of reason offense, erred by declining to dismiss the Indictment because the face of the Indictment failed to allege a naked horizontal price fixing agreement.

Fourth, the district court reversibly erred by applying the judge-made *per se* rule to this criminal case because doing so either (1) imposed an unconstitutional "conclusive presumption" that two of the three elements of the offense are met, or (2) unconstitutionally altered the elements of the offense such that the purported § 1 offense was not created by Congress and, therefore, is not a valid offense.

15

II.     The district court erred in holding that § 1 of the Sherman Act is not unconstitutionally vague as applied.

First, § 1 literally criminalizes every contract and, thus, requires courts to determine which contracts are criminal. A statute is unconstitutionally vague if it sets a net large enough to capture any offender and leaves it to law enforcement, juries, and courts to determine whom to imprison and whom to set free. Therefore, § 1 is unconstitutionally vague as applied to this criminal prosecution.

Second, there are insufficient guidelines for what constitutes the purported *per se* offense of bid rigging. Before the guidelines, big rigging had a settled meaning—that is, bid rotation, which was not alleged. In 1982, this Court expanded the definition of bid rigging to include any agreement between competitors regarding submitting or withholding contract offers. Such conduct captures vertical price fixing agreements, which the Supreme Court deemed not to warrant *per se* treatment, as well as collaborative conduct, which is generally analyzed under the rule of reason. Moreover, there is no bright line separating *per se* from rule of reason analysis, and because the amount of proof required to determine whether the *per se* rule should apply varies case-by-case. This conflict in

16

the law and case-by-case process for determining *per se* rule applicability renders any purported *per se* offense unconstitutionally vague for lack of objective standards necessary to prevent arbitrary enforcement. Finally, if applying the *per se* rule changes the elements of the offense, as the government has argued, a *per se* § 1 prosecution is unconstitutionally vague because the *per se* rule is a judicial creation, and the void-for-vagueness doctrine exists, primarily, to ensure that Congress defines offenses.

Third, the essential inquiry for any Sherman Act case is whether the conduct in question enhanced competition. It is an unconstitutionally vague application of § 1 to use it to criminalize conduct that enhanced competition. Here, the uncontested record evidence established that the charged anticompetitive conduct enhanced competition. Therefore, the § 1 offense is unconstitutionally vague as applied for this reason as well.

Finally, *Nash v. United States*, 229 U.S. 373, 376-78 (1913) (upholding § 1 against a limited constitutional vagueness challenge), does not control because (1) *Nash* did not address whether § 1 violated the "more important" non-delegation prong of the vagueness test; (2) *Nash* interpreted § 1 as incorporating a static common law meaning of the

17

statutory term "restraint of trade," which interpretation the Supreme Court has subsequently expressly rejected; (3) the substance of § 1 has changed dramatically since 1913 through the common law approach, such that *Nash* addressed the constitutionality of a substantively different statute; (4) *Nash* did not address whether § 1 is unconstitutionally vague as applied to a *per se* rule criminal prosecution; and (5) *Nash* did not address whether the definition of bid rigging is unconstitutionally vague or whether it is unconstitutionally vague to use § 1 to criminalize procompetitive conduct.

III.    The district court impermissibly directed a verdict on two essential elements of the § 1 offense (unreasonableness and *mens rea*). The elements of a criminal violation of § 1 are (1) an agreement (2) to impose an unreasonable restraint of trade (3) knowing that the conduct would unduly suppress competition.  By operation of the *per se* rule, elements 2 and 3 were taken from the jury in violation of the Fifth and Sixth Amendments.

IV.    The government cannot show that the district court's errors with respect to the § 1 charge played no role in the jury's consideration of the fraud charges because (1) the alleged fraud was designed to conceal

18

the bid rigging, so any errors related to the bid rigging charge necessarily infected the jury's consideration of the fraud charges; and (2) the district court explicitly instructed the jury to consider the erroneous *per se* instructions when considering the fraud charges.

## STANDARD OF REVIEW

The court reviews *de novo* legal questions, including constitutional questions and the question of whether a jury instruction failed to correctly state the applicable law. *See United States v. Lindberg*, 39 F.4th 151, 157 (4th Cir. 2022); *United States v. Malloy*, 568 F.3d 166, 176 (4th Cir. 2009).

## ARGUMENT

## I.    THE DISTRICT COURT REVERSIBLY ERRED IN DETERMINING THAT THE *PER SE* RULE APPLIED TO THE SHERMAN ACT CHARGE.

"[T]he per se rule is the trump card of antitrust law. When an antitrust plaintiff successfully plays it, he need only tally his score." *Med. Ctr. At Elizabeth Place, LLC v. Atrium Health Sys. ("Elizabeth Place")*, 922 F.3d 713, 718 (6th Cir. 2019) (quoting *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1362-63 (5th Cir. 1980)). The district court erred in giving the prosecution this "trump card."

**A.** **The district court erred in determining that the Indictment did not allege a "dual distribution" arrangement, despite unrebutted economic analysis to the contrary.**

    **i.** **Dual distribution arrangements are not *per se* violations, and, before applying the *per se* rule to an alleged agreement between vertically related entities, the district court must conduct an evidentiary inquiry to determine the purpose of the agreement.**

Section 1 of the Sherman Act provides, "[e]very contract [or] combination … in restraint of trade … is … illegal." Long ago, the Supreme Court recognized that the statutory language is "broad enough to embrace every conceivable contract," and thus, if read literally, would "cause[] any [economic agreement] … anywhere in the whole field of human activity to be illegal if in restraint of trade[.]" *Standard Oil Co. v. United States*, 221 U.S. 1, 60 (1911). Accordingly, the Court eschewed a literal reading of the statute and added an element of unreasonableness. *See, e.g., Leegin I*, 551 U.S. at 885.

Therefore, the elements of § 1 are "(1) a contract, combination, or conspiracy; (2) that imposed an *unreasonable* restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002) (emphasis added); *N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 371 (4th Cir. 2013); *Valuepest.com of Charlotte, Inc. v. Bayer Corp.*, 561 F.3d 282, 286

20

(4th Cir. 2009); *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 27 F.3d 499, 508 (4th Cir. 2002). Criminal violations also require a third element— that is, a showing of *mens rea*: that the defendant knew that their conduct would unduly undermine competition. *United States v. U.S. Gypsum Co.*, 438 U.S. 442, 444-46 (1978).

Adding the requirement of "unreasonableness" limited the scope of the statute so that it no longer applied to every contact, but it did not provide any "principled or objective standard," *Johnson v. United States*, 574 U.S. 591, 592 (2015), for assessing what conduct the statute criminalizes. Thus, "[i]n consequence of the vagueness of its language …, the courts have been left to give content to [§ 1]." *Apex Hosiery*, 310 U.S. at 489; *see also Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 354 (1982) ("Given its generality, our enforcement of the Sherman Act has required the Court to provide much of its substantive content.").

This process of courts giving content to the statute has been guided by the primary purpose of the statute, which is to enhance "interbrand competition"—that is, "the competition among manufacturers selling different brands of the same type of product"—and has been accomplished through a "case-by-case adjudication" process akin to the

"common-law approach." *Leegin I*, 551 U.S. at 890, 899. This "case-by-case" approach is costly for litigants, taxes judicial resources, and fails to give certainty to businesses. *Maricopa Cnty.*, 457 U.S. at 343-44. Additionally, "[j]udges often lack the expert understanding of industrial market structures and behavior to determine with any confidence a practice's effect on competition." *Id.* at 343. Therefore, for the sake of "economic prediction, judicial convenience, and business certainty," the Court has adopted certain so-called *per se* rules. *Id.* at 344, 354.

When applicable, a Sherman Act *per se* rule creates "a conclusive presumption that the restraint is unreasonable." *Id.* at 344; *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (small group of restraints are unreasonable *per se*[.]"); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990); *Gypsum*, 438 U.S. at 475 ("Conclusive presumptions play a central role in the enforcement, both civil and criminal, of the Sherman Act.") (Stevens, J., concurring in part); *Ratino v. Med. Serv. of D.C. (Blue Shield)*, 718 F.2d 1260, 1269 (4th Cir. 1983). Applying a *per se* rule in a criminal case also provides the government a conclusive presumption that the requisite *mens rea* has been proven. *See United States v. W.F. Brinkley & Son Const. Co. ("Brinkley")*, 783 F.2d 1157, 1162

(4th Cir. 1986) ("[M]ere existence of a [*per se* unreasonable] agreement establishes the defendant's illegal purpose[.]").

*Per se* rules are not products of statutory interpretation; they are, instead, created by the Court, and the Court has determined that it is free to change these rules when necessary "to meet the dynamics of present economic conditions," *Leegin I*, 551 U.S. at 899–900 (rejecting *stare decisis* as a reason not to rescind a *per se* rule because "the Court … treat[s] the Sherman Act as a common-law statute"); *see also United States v. Topco Assocs., Inc.*, 405 U.S. 596, 609–10 (1972) ("*we have formulated* per se rules" (emphasis added)); *Maricopa Cnty.*, 457 U.S. at 344 ("Once experience with a particular kind of restraint enables *the Court* to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable." (emphasis added)).  Indeed, the Court has held that "it would make no sense to create out of the single term 'restraint of trade' a chronologically schizoid statute, in which a 'rule of reason' evolves with new circumstances and new wisdom, but a line of *per se* illegality remains forever fixed where it was." *Leegin I*, 551 U.S. at 900 (cleaned up).  Of course, if the *per se* rule was a mere statutory interpretation, it could not "evolve with new circumstances and new [judicial] wisdom." *Id.*

23

By design, these judicially created *per se* rules reduce litigation costs by removing from the jury the questions of economic reasonableness of the alleged agreement and *mens rea*. By doing so, the determination that the *per se* rule applies often gives the plaintiff or prosecutor a dispositive "trump card." *Elizabeth Place*, 922 F.3d at 718.

Because a district court's decision to apply a *per se* rule is often outcome-determinative, and because the "rule of reason" is the default rule in any Sherman Act case, *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006), district courts must apply the rule of reason unless "a restraint clearly and unquestionably falls within one of the handful of categories that have been collectively deemed *per se* anticompetitive," *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 273 (6th Cir. 2014) (quoting *Expert Masonry, Inc. v. Boone Cnty.,* 440 F.3d 336, 343–44 (6th Cir. 2006)). Thus, a district court "cannot act perfunctorily when distinguishing restraints that merit a *per se* approach from those that deserve rule of reason analysis." *Id*. (quoting *Expert Masonry, Inc.,* 440 F.3d at 343).

The prohibition on "perfunctory" decisions applying the *per se* rule is particularly important because, over time, the line between rule of reason cases and *per se* cases has been "blurr[ed]." *Id.* at 274.

24

> "[T]here is often no bright line separating *per se* from Rule of Reason analysis," since "considerable inquiry into market conditions" may be required before the application of any so-called "*per se*" condemnation is justified.

> "[W]hether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same—whether or not the challenged restraint enhances competition."

*Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 779–80 (1999) (quoting *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 104 & n.26 (1984)) (originally one paragraph).

Automatic application of a *per se* rule is especially inappropriate where, as here, the alleged illegal agreement was between entities at different levels of the supply chain. These relationships are known as "vertical" relationships.

> Horizontal conspiracies involve agreements among competitors at the same level of market structure to stifle trade, such as agreements among manufacturers or among distributors to fix prices for a given product, and therefore may constitute per se violations of antitrust law.

> Vertical conspiracies, on the other hand, involve agreements among actors at different levels of market structure[.]

*Care Heating & Cooling, Inc. v. Am. Stand., Inc.*, 427 F.3d 1008, 1013 (6th Cir. 2005) (originally one paragraph). And vertical agreements are analyzed under the rule of reason. *See, e.g., Am. Express Co.*, 138 S. Ct. at 2283-84.

25

Determining the "orientation" of the agreement often "require[s] considerable inquiry into market conditions before *the evidence* justifies [the conclusive] presumption of anticompetitive conduct." *NCAA*, 468 U.S. at 104 n.26 (emphasis added). To determine whether "the evidence justifies" the *per se* rule, the district court must first consider "evidence." *Id*.; *see also Donald B. Rice Tire*, 638 F.2d at 16. The district court must specifically determine the purpose of the agreement, as well as the "relevant market" and the full scope of the agreement, when there is a question about whether the *per se* rule applies. *See Donald B. Rice*, 638 F.2d at 16.

For example, in *Donald B. Rice*, a case involving an alleged agreement between a manufacturer and its dealers, this Court held that deciding whether an agreement was vertical (and thus subject to the rule of reason) or horizontal (and thus *per se* unreasonable) required the court to determine whether the "purpose" of the agreement was to undermine or to enhance "interbrand competition." *Id.* at 16-17. And the Court agreed with the district court that, under the circumstances, the analysis to determine the purpose of the agreement "nearly coincide[d]" with full rule of reason analysis. *Id.* Thus, *Donald B. Rice* establishes that a

searching evidentiary inquiry is required to determine the purpose of the agreement when the alleged anticompetitive agreement is one between vertically related parties. *See id*.

To understand the purpose of the agreement, the court must identify the relevant market and the full scope of the agreement. *Cf. id*. When determining the "relevant market," courts must keep in mind that the Sherman Act "protects competition, not competitors," *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 720 (4th Cir. 2021), and primarily protects a specific type of competition—"interbrand competition"—which is competition "among manufacturers." *Leegin I*, 551 U.S. at 890. Accordingly, a court that fails to consider the relevant market cannot appropriately determine whether to apply the *per se* rule. Similarly, in determining the purpose of the agreement, the district court must identify the full scope of the agreement. "[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *United States v. Patten*, 226 U.S. 525, 544 (1913).

Because courts must view the alleged anticompetitive agreement in light of its full scope within the relevant market, the mere fact that

27

entities compete for a single contract or series of contracts does not categorically make them "competitors" for Sherman Act purposes. For example, in "dual distribution" arrangements—where "the distributor and manufacturer also compete at the distribution level," *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997)—courts uniformly apply the rule of reason to price agreements between the dual distributing manufacturer and the distributor, even though the manufacturer and distributor compete for individual sales of the good or goods at issue. *See Leegin II,* 615 F.3d at 421 & n.8. If courts focused only on individual contract offerings, as opposed to the "relevant market" and the full scope of the agreement, when determining whether entities are "competitors" for Sherman Act purposes, then courts would uniformly apply the *per se* rule to price agreements in dual distribution systems. Yet, the opposite is true.

In short, where an alleged agreement involves entities at different levels of the supply chain, courts typically apply the rule of reason. Before doing otherwise, the court must conduct an evidentiary inquiry to identify the relevant market and the full scope of the agreement—and then to determine the purpose of the agreement. *See Donald B. Rice*, 638 F.2d at 16.

Determining the full scope of the agreement is necessary even when the entities in question are not vertically related because

> [e]ven within horizontal agreements between competitors or potential competitors, "[a] court must distinguish between 'naked' restraints, those in which the restriction on competition is unaccompanied by new production or products, and 'ancillary' restraints, those that are part of a larger endeavor whose success they promote." *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188–89 (7th Cir. 1985) (citing *NCAA*, 468 U.S. at 104) ….
>
> > If the restraint, viewed at the time it was adopted, may promote the success of this more extensive cooperation, then the court must scrutinize things carefully under the [r]ule of [r]eason ….
>
> *Id*. (internal quotations omitted). The proper inquiry thus requires an investigation into "whether an agreement promoted enterprise and productivity at the time it was adopted. If it arguably did, then the court must apply the [r]ule of [r]eason to make a more discriminating assessment." *Id*. Because of the inherently fact-intensive nature of this inquiry, disposition of an antitrust suit at the pleading stage is accordingly rarely appropriate.

*Lumber Liquidators, Inc. v. Cabinets To Go, LLC*, 415 F. Supp. 3d 703, 712–13 (E.D. Va. 2019) (internal quotation marks omitted); *accord In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1013 (7th Cir. 2012).

Thus, both dual distribution systems and collaborative or joint ventures involve isolated conduct that may initially appear on the surface to constitute a "naked horizontal restraint" that would trigger *per se*

29

treatment, but that is instead subject to the rule of reason because the isolated conduct is essential to a competition-enhancing overarching agreement. In such circumstances, "whe[n] there exists a *plausible* procompetitive rationale for the restraint," the court must apply the rule of reason. *Elizabeth Place*, 922 F.3d at 726 (emphasis in original).

Because vertical agreements do not warrant *per se* treatment, most courts faced with alleged agreements between vertically related entities apply the rule of reason rather than engage in the searching inquiry necessary to correctly determine whether the *per se* rule should apply in such contexts. *See, e.g., Donald B. Rice*, 638 F.2d at 16. The same is true for "joint ventures and similar arrangements." *Med. Ctr. At Elizabeth Place LLC v. Premier Health Partners*, No. 3:12-CV-26, 2012 WL 3776444, at *5 n.11 (S.D. Ohio Aug. 30, 2012); *see also NCAA v. Alston*, 141 S. Ct. 2141, 2155 (2021) ("Most restraints challenged under the Sherman Act—including most joint venture restrictions—are subject to the rule of reason[.]").

A court that decides to deviate from this path and apply the *per se* rule to alleged agreements between vertically related entities or agreements related to collaborative ventures can do so only after

30

engaging in the requisite "fact-intensive" "evidentiary" inquiry discussed above. *Lumber Liquidators*, 415 F. Supp. at 713, 714 (declining to determine which standard applies based on the pleadings alone) ("[T]he Court has not been presented with sufficient evidence of market conditions to justify imposing the per se standard … especially in an area where the Supreme Court has cautioned against the premature adoption of per se rules." (citing *Leegin I*, 551 U.S. at 886)). And a court could apply the *per se* rule only if the restraint "clearly and unquestionably" warrants *per se* treatment. *In re Se. Milk Antitrust Litig.*, 739 F.3d at 273. For, where "the economic impact" of a business practice was "not immediately obvious," the rule of reason must apply. *Id.* (quoting *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 477, 458–59 (1986)).

It would be error for a court to rely on the government's allegations alone as a substitute for this requisite evidentiary inquiry, particularly where, as here, the court is provided substantial evidence that the agreement enhanced competition. *See* JA102-588. In other words, "the fact that the United States labeled the agreement a [*per se* violation] does not make it so." *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039–40 (N.D. Cal. 2013).

31

*eBay* is instructive. There, the trial court found that the government had sufficiently pled a *per se* violation, but the court refused to give the government the benefit of the *per se* rule on the government's word alone because the "defendant advance[d] plausible arguments that [the] practice enhance[d] overall efficiency and ma[de] markets more competitive." *Id.* at 1039. "[T]o make a rule determination, the court must first consider whether the alleged [anticompetitive] agreement is ancillary to a procompetitive business purpose." *Id.* The court determined it cannot rely on pleadings alone because it "simply cannot determine with certainty the nature of the restraint, and by extension, the level of analysis to apply … [without] 'facts that are developed only in discovery.'" *Id.* at 1040 (quoting in parenthetical II Phillip E. Areeda, Antitrust Law, ¶ 305e at 69 (3d ed. 2007)).

Similarly, in *NCAA*, the Supreme Court refused to apply the *per se* rule to an agreement due to the nature of the specific market at issue despite acknowledging that there was a "horizontal price fixing" agreement. 468 U.S. at 100-01. The Court noted that, "whether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same—whether or not the

32

challenged restraint enhances competition." *Id.* at 104. Of course, if courts were to discontinue all market analysis once a "horizontal price fixing" agreement was alleged, the Court in *NCAA* could not have reached the "essential inquiry." *Id.*

Thus, when an alleged anticompetitive agreement involves vertically related parties, and particularly where the defendant presents and thoroughly supports a procompetitive rationale for the restraint, the court must determine the plausibility of the rationale and cannot rely on the allegations in the complaint or indictment alone when deciding whether to apply the *per se* rule. *Elizabeth Place*, 922 F.3d at 726. In this context, reliance on one party's allegations to give that party an outcome-determinative litigation "trump card," *Elizabeth Place*, 922 F.3d at 718, would violate due process because it would be the functional equivalent of giving one party in litigation a substantial and potentially undeserved advantage based on what amounts to an *ex parte* presentation. And "[i]t is settled beyond peradventure that, in our system of justice, *ex parte* judicial proceedings … are greatly disfavored [because] … such proceedings present substantial due process concerns[.]" *RZS Holdings AVV v. PDVSA Petroleo S.A.*, 506 F.3d 350, 356–57 (4th Cir. 2007) (collecting cases).

33

Ultimately,

> there is often no bright line separating per se from Rule of Reason analysis, since considerable inquiry into market conditions may be required before the application of any so-called "per-se" condemnation is justified.

*Cal. Dental*, 526 U.S. at 779.

> Rather than focusing upon the category to which a particular restraint should be assigned, therefore, the Court emphasized the basic point that under § 1 the essential inquiry is "whether … the challenged restraint enhances competition."

> In order to make that determination, a court must make "an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint," which in some cases may not require a full-blown market analysis.

*Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 35 (D.C. Cir. 2005) (quoting *Cal. Dental*, 526 U.S. at 779, 781) (originally one paragraph); *cf. Am. Express Co.*, 138 S. Ct. at 2285 ("[L]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466–467 (1992))). "Thus, in a § 1 dispute, defendants always have the opportunity to challenge efforts to characterize their behavior as inherently pernicious." William E. Kovacic, *The Future Adaptation of the Per Se Rule of Illegality in U.S. Antitrust Law*, 2021 Colum. Bus. L. Rev. 33, 50 (2021) (citing cases).

Ultimately, criminal defendants are entitled to a meaningful hearing at a meaningful time. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The process required is a sliding scale that balances three factors: (1) the private interest affected (primarily the degree of deprivation imposed upon the citizen as a result of the decision); (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

Under this test and the other precedent discussed herein, when faced with an alleged agreement between a "manufacturer" and its "dealer," JA45-46, and when faced with a thoroughly supported procompetitive rationale, JA102-588, it was reversible error for the district court to refuse to consider the rationale and to instead rely solely on the face of the government's unsupported allegations in deciding that the *per se* rule applies. But, as discussed in the following section, the district court did not need to conduct any economic analysis because the face of the Indictment alleged a "dual distribution" arrangement, and such arrangements are uniformly analyzed under the rule of reason.

ii.   **The district court erred in determining that the face of the Indictment did not allege a dual distribution arrangement.**

A dual distribution arrangement is one where "the distributor and manufacturer also compete at the distribution level." *Elecs. Commc'ns*, 129 F.3d at 243. Courts uniformly apply the rule of reason to such arrangements. *Leegin II*, 615 F.3d at 421 & n.8 (citing cases).

The Indictment charged a violation of § 1 based on an alleged agreement between vertically related parties. JA45-46. The alleged anticompetitive agreement was a price agreement between this manufacturer and its distributor for NCDOT contracts. JA54-55. The Indictment specifically alleged that work on the NCDOT contracts at issue was "part of that [manufacturer-distributor] relationship." JA46, ¶ 7.

Thus, the face of the Indictment alleged that a distributor and manufacturer also competed at the distribution level, which is the definition of a dual distribution agreement. *See, e.g., Elecs. Commc'ns*, 129 F.3d at 243. Therefore, the district court erred by not applying the rule of reason. Had it done so, it would have dismissed the Sherman Act charge. JA964-969. Therefore, the district court reversibly erred both by

36

denying Mr. Brewbaker's motion to apply the rule of reason, JA962-985, and by denying Mr. Brewbaker's motion to dismiss the Sherman Act charge, JA1333-1342.

The district court distinguished the alleged arrangement from a "dual distribution" arrangement in a footnote, writing,

> The court finds convincing that dual-distribution systems typically refer to distribution of the same product whereas here defendant Contech sells aluminum products to a distributor and then submits intentionally losing bids on aluminum product installation projects.

JA983.  Rather than provide an explanation based on economics or a court drawing this distinction, the district court relied solely on *United States v. Koppers Co.*, 652 F.2d 290, 296–97 (2d Cir. 1981).  But *Koppers* does not support the district court's conclusion.

In *Koppers*, the agreement at issue was between "the only [two] participants" in the bidding in question.  *Id.* at 292.  These two entities agreed to rotate bids with Koppers getting all contracts in the eastern half of the state and western contracts going to his co-conspirator.  *Id.* Five years after this conspiracy began, Koppers began supplying his co-conspirator with road tar.  *Id.* at 297.  After trial, Koppers complained that the district court's application of the *per se* rule violated the doctrine

that the rule of reason applies to vertical restraints. *Id*. at 296. In rejecting this claim, the court explained that the agreement began as an agreement between horizontal competitors. *Id*. at 297. It also noted that "[t]here was no foundation *in the evidence* in this case to support … at least *some possibility* of increased competition." *Id*. at 296 (emphasis added).

Here, on the other hand, the face of the Indictment established that the vertical, manufacturer-dealer relationship existed "before 2009," and that the alleged conspiracy started "[f]rom at least 2009." JA46-47. Thus, unlike *Koppers*, the vertical relationship did not start years after the alleged horizontal price fixing agreement began. *Cf. Polk Bros.*, 776 F.2d at 188–89 ("If the restraint, *viewed at the time it was adopted*, may promote the success of [ ] more extensive cooperation, then the court must scrutinize things [ ] under the [r]ule of [r]eason." (emphasis added)).

Moreover, in *Koppers*, the parties to the anticompetitive agreement were the only bidders, whereas the Indictment contained no allegation that Contech and Pomona were the only bidders (because there was another bidder, Lane).

38

Finally, the court in *Koppers* relied on "the evidence" to determine whether "some possibility of increased competition" could have resulted from the agreement. 652 F.2d at 296. And, here, the only evidence was that the agreement in question enhanced competition. JA102-188. But the district court ignored this evidence.

The rule of reason applies unless the restraint "clearly and unquestionably" warrants *per se* treatment, and a district court errs when applying a "perfunctory" analysis to reject this presumptive rule of reason. *In re Se. Milk Antitrust Litig.*, 739 F.3d at 273-74. The district court's decision that the arrangement was not a dual distribution arrangement based on a single footnote without citation to any economic support or relevant case law constituted erroneous "perfunctory" analysis. The face of the Indictment alleged a dual distribution arrangement, JA44-50, JA114, and that the NCDOT work at issue was "part of that relationship," JA46. Therefore, the district court erred by denying Mr. Brewbaker's motion to apply the rule of reason and/or his motion to dismiss the § 1 charge.

The government cannot carry its burden of proving that the district court's error was harmless beyond a reasonable doubt, *see Chapman v.*

39

*California*, 386 U.S. 18, 24 (1967), because the only record evidence related to the competitive impact of the alleged anticompetitive agreement was that the agreement enhanced competition.  JA102-588.  Accordingly, reversal is required.

> ### iii.   The district court erred by refusing to consider Professor Elzinga's affidavit before deciding to reject the defendants' plausible procompetitive justification.

In support of the defendants' motions for the district court to apply the rule of reason, the defendants attempted to present the district court with substantial support for finding not only that the face of the Indictment alleged a dual distribution arrangement, but also that the alleged anticompetitive agreement was part of a collaborative, vertical agreement that enhanced competition.  *See* JA102-588.

The government responded by asking the district court to ignore the defendants' economics presentation entirely and to instead rely on the face of the Indictment alone in determining whether to apply the rule of reason or the *per se* rule.  JA589-614.

The district court recognized that "the conduct may … be procompetitive, JA974.  Of course, "whe[n] there exists a *plausible* procompetitive rationale for the restraint," the court must apply the rule

of reason. *Elizabeth Place*, 922 F.3d at 726 (emphasis in original). Therefore, the inquiry should have ended there, and the district court should have granted defendants' motion to apply the rule of reason. *See id*.

The district court also recognized that "there are aspects of defendant Contech and [Pomona]'s relationship that are vertical," JA984, and that determining whether the agreement was a vertical agreement "can be difficult as *a matter of fact*," JA983 (emphasis added). But it refused to hold a hearing or consider evidence and instead rejected the presumptive rule of reason and applied the exceptional *per se* rule based on the face of the Indictment alone. JA968, JA985. And it did so even though it was unsure how to address this issue procedurally. JA965, JA967.

The district court's determination that "[a]lthough the conduct may allegedly be procompetitive, there is no need to look at economic impact as described in the Elzinga affidavit because where a practice is per se illegal … 'further inquiry on the issues of intent or the anti-competitive effect is not required,'" JA974 (quoting *Brinkley*, 783 F.2d at 1162), was error. This quotation from *Brinkley* related to whether the jury should

41

consider intent or economic effect in deciding guilt after the *per se* rule has been deemed applicable, not whether the court should consider intent and economic effect in deciding whether to apply the *per se* rule. *Brinkley*, 783 F.2d at 1161-62 (rejecting a jury instruction challenge). And the district court's refusal to consider the procompetitive justification or any evidence and its reliance on the face of the Indictment to decide to apply the *per se* rule was erroneous, because a court cannot conduct "an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint," if it does not address "the circumstances, details, and logic of [the] restraint." *Cal. Dental*, 526 U.S. at 781; *see also see Donald B. Rice*, 638 F.2d at 16.

The district court did not determine the purpose of the agreement, the relevant market, or the full scope of the agreement. And it could not make these requisite determinations based on the face of the Indictment alone. Indeed, the court recognized that determining the orientation of the agreement was a "matter of fact" (*i.e.*, a factual question). JA983. As noted above, accepting one party's allegations as determinative is the equivalent of utilizing an *ex parte* process, which creates substantial due process concerns. *RZS Holdings AVV*, 506 F.3d at 356–57.

42

For example, the district court rejected Mr. Brewbaker's argument that the relationship at issue was vertical by concluding that "[a]ny vertical relationship, here, only intersected with and gave rise to the horizontal arrangement at issue." JA984-985. The court did not refer to or analyze the available evidence in support of this factual conclusion. *See id*. Instead, the court cited *Koppers*, 652 F.2d at 296–97. But, in *Koppers*, the court upheld application of the *per se* rule because "[t]here was no foundation *in the evidence* in this case to support … at least some possibility of increased competition." *Id*. at 296 (emphasis added). Here, the only "evidence in th[e] case" established that the conduct in question enhanced competition. JA102-188.

The district court also cited *Donald B. Rice* for the proposition that "any arrangement's orientation should be examined on a case-by-case basis." JA982. As noted above, in *Donald B. Rice*, this Court held that a searching evidentiary inquiry was required to determine whether applying the *per se* rule would be appropriate. 638 F.2d at 16.

Thus, the district court should have applied the rule of reason because there was a question about whether the *per se* rule should apply. But, if it was inclined to go further, it could not rely solely on the

Indictment; it had to consider evidence of the procompetitive effect to answer the "essential inquiry … [of] whether or not the challenged restraint enhance[d] competition." *Cal. Dental*, 526 U.S. at 780 (quoting *NCAA*, 468 U.S. at 104); *see also Donald B. Rice*, 638 F.2d at 16.

Any procedural uncertainty should have been resolved by resorting to the fundamental *Mathews v. Eldridge* due process test to ensure that the court was providing "an enquiry meet for the case," 526 U.S. at 781. Applying this test, the private interest at stake is the loss of liberty for up to 10 years and crippling financial penalties based on the district court giving the government a "trump card," *Elizabeth Place*, 922 F.3d at 718. The risk of erroneous deprivation from allowing district courts to rely on government allegations alone to apply the *per se* rule is tremendous where an alleged agreement involves vertically related parties and where, as here, the uncontested economic evidence established that the restraint in question was procompetitive, JA102-188. Indeed, the Court has recognized that application of the *per se* rule will result in erroneous results. *See Maricopa Cnty.*, 457 U.S. at 344 ("[T]he match between the presumed and the actual is imperfect[, but] [f]or the sake of business certainty and litigation efficiency, we have tolerated [factually erroneous

44

results].").    The additional safeguard of, at least, considering a defendant's proffered information regarding the procompetitive effect before applying the *per se* rule where the alleged restraint involves vertically related entities would have substantial value in avoiding erroneous results.  And the government's interest in not providing those additional safeguards—*i.e.*, "litigation efficiency"—has little weight compared to the interest in preventing erroneous deprivations of a person's physical freedom for up to 10 years.

The district court erred by considering the face of the Indictment alone and by ignoring the substantial economic presentation showing that the arrangement was procompetitive, was a vertical agreement (a dual distribution agreement), and was ancillary to a collaborative venture, when deciding to give the government a "trump card" that virtually assured its victory in the prosecution of Mr. Brewbaker. Accordingly, pursuant to the Fifth and Sixth Amendments, Mr. Brewbaker's conviction must be vacated.

## B.    The district court reversibly erred by finding that the face of the Indictment alleged a *per se* violation.

Rather than find that the Indictment alleged a dual distribution arrangement or grapple with the economics, the district court applied a

45

simple—but erroneous—test to reach its decision to apply the *per se* rule—that is, that "the restraint at issue was horizontal because the two [entities] presented themselves as potential competitors" for a set of contracts with a particular customer. JA984. On this basis, the district court determined that the Indictment alleged a *per se* illegal horizontal price-fixing agreement. This decision was reversible error for at least three reasons: (1) the Indictment did not allege that the entities in question were "competitors"; (2) it alleged a collaborative venture; and (3) entities are not necessarily horizontal competitors merely because they are co-bidders, since the Sherman Act protects competition broadly, as opposed to protecting specific competitors.

While purporting to rely on the face of the Indictment to determine whether to apply the *per se* rule, the district court actually read into the Indictment an allegation that was not made by the grand jury—that is, that Contech and Pomona were "competitors" for Sherman Act purposes. *Cf.* JA973 ("[T]he indictment alleges facts *permitting an inference* that defendant Contech engaged in an 'agreement between competitors[.]'") (emphasis added)).

The Indictment alleged a bid-rigging scheme, and bid rigging is a form of price fixing. *See, e.g., United States v. Fenzl*, 670 F.3d 778, 780 (7th Cir. 2012); *United States v. Gosselin World-Wide Moving, N.V.*, 411 F.3d 502, 508 (4th Cir. 2005). Only naked horizontal price fixing warrants *per se* treatment. *Texaco*, 547 U.S. at 5. Accordingly, a price-fixing agreement, such as bid rigging, is *per se* illegal only if the parties to the agreement are horizontal competitors not acting in furtherance of a collaborative venture. *Id.*

The Indictment alleged that Contech was a manufacturer and Pomona was its dealer. JA45-46. This is a vertical agreement. The Indictment did not allege that these entities were "competitors" in the relevant market; instead, it alleged that the NCDOT work was "part of th[eir] [manufacturer-dealer] relationship." JA44-62. Therefore, the Indictment failed to allege a naked horizontal price fixing agreement, and the district court reversibly erred by applying the *per se* rule and by not dismissing the Sherman Act charge.

Despite the failure of the grand jury to allege that Contech and Pomona were "competitors," the district court determined that these entities were "competitors" because they both bid for the same contracts.

47

JA984-985. This rule is erroneous because it takes too narrow a view both of the relevant market and of the scope of the agreement by defining competition at the individual contract level, as opposed to the market level. "[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Patten*, 226 U.S. at 544. In the context of collaborative business ventures, even horizontal agreements are not *per se* illegal where those horizontal agreements are even "arguably" "part of a larger endeavor whose success they promote." *Lumber Liquidators*, 415 F. Supp. 3d at 712–13 (quoting *Polk Bros.,* 776 F.2d at 188–89). Price agreements in dual distribution arrangements are treated as vertical restraints and subject to the rule of reason even though the manufacturer and distributor "compete" for individual customers. Therefore, the district court's rule—that competition for a specific customer or contract categorically makes entities "competitors" under § 1—is contrary to the holdings of each of the nine circuits to consider the treatment of dual distribution arrangements. *Cf. Leegin II*, 615 F.3d at 420–21 & n.8.

Underlying the district court's decision may have been an unstated belief that the bidding process deserves special protection. But, under

48

the district court's rule, a bid price agreement between vertically related entities would be criminal even if that agreement were disclosed to and approved by the customer who requested the bids.  For, once the *per se* rule applies, no justification for the alleged agreement is acceptable.

Ultimately, the bid process is merely one of many ways customers solicit contract offers, and this process is not given special protection under the Sherman Act.  *Cf. Fenzl*, 670 F.3d at 780 (7th Cir. 2012) (bid rigging is merely a form of price fixing).  Therefore, there is no rule that conduct that would be analyzed under the rule of reason outside the bidding context is a *per se* violation within the bidding context.  The district court reversibly erred in applying the *per se* rule and by failing to dismiss the § 1 charge.

**C.    The district court erred by applying the *per se* rule to this criminal case because the *per se* rule either constitutes an unconstitutional conclusive presumption or unconstitutionally alters the elements of the offense.**

This Court has identified the elements of a § 1 violation as "(1) a contract, combination, or conspiracy; (2) that imposed an *unreasonable* restraint of trade," *Dickson*, 309 F.3d at 202, and, in *Gypsum*, the Supreme Court determined that a criminal violation also requires a

showing (3) that the defendant acted with criminal intent, 438 U.S. at 444-46. The Indictment alleges both the elements of "unreasonableness" of the alleged restraint of trade as well as criminal intent. JA44, JA50 ("The Grand Jury charges that … [the defendants] … *knowingly* participated in a combination and conspiracy *to suppress and eliminate competition* …. The combination and conspiracy was a *per se* unlawful, and thus *unreasonable*, restraint … in violation of … § 1." (emphasis added)). By operation of the *per se* rule, the government was relieved of its burden of proving these elements. The Supreme Court has repeatedly held that conclusive presumptions are unconstitutional. *E.g., Francis v. Franklin*, 471 U.S. 307, 317 (1985) (A "conclusive presumption" that "remov[es] [an] element from the case entirely if the government proves [certain] predicate facts" is "impermissible under the Due Process Clause."); *cf. Lindberg*, 39 F.4th at 159–60 ("Criminal convictions must rest upon a jury determination that the defendant is guilty of *every element* of the crime with which he is charged, beyond a reasonable doubt." (internal quotation marks omitted)). A conclusive presumption also deprives defendants of the Sixth Amendment right to present a complete defense. *Cf. Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)

50

(Sixth Amendment is violated by evidentiary rules that are arbitrary or disproportionate to the purposes they serve).

Here, by applying the "trump card" of the *per se* rule, *Elizabeth Place*, 922 F.3d at 718, the government needed only to prove that the alleged agreement existed (element 1), in which case the unreasonable restraint of trade and criminal intent elements (elements 2 and 3) were conclusively presumed to have been proven as a matter of law.

Because unreasonableness and criminal intent are essential elements of a § 1 offense, and because these issues were taken from the jury, the Sherman Act conviction must be vacated pursuant to the Fifth and Sixth Amendments.

Despite the Supreme Court's repeated statements that the *per se* rule is "a conclusive presumption that the restraint is unreasonable," *Maricopa Cnty.*, 457 U.S. at 344; *Am. Express Co.*, 138 S. Ct. at 2284, the government has urged this Court to determine that applying the *per se* rule changes the elements of the offense. *See* Gov. Resp. (Docket No. 17) at 11, 15. This argument is incorrect. But, even if correct, Mr. Brewbaker's conviction is invalid because the *per se* rule was created— not by Congress—but by the judiciary, and any set of elements created

by this judge-made rule cannot constitute a criminal offense, since only Congress can make conduct a crime. *Cf. Liparota v. United States*, 471 U.S. 419, 424, (1985) ("The definition of the elements of a criminal offense is entrusted to the legislature[.]" (citing *United States v. Hudson*, 11 U.S. 32, 32 (1812))); *United States v. Bishop*, 740 F.3d 927, 933 (4th Cir. 2014) (Only Congress has "rightful authority to define the elements of federal offenses.").

The government's argument that *per se* rules create separate offenses—each with different elements—is incorrect for at least three reasons.

First, nothing in the plain language of § 1 suggests that it creates multiple offenses.

Second, the Judiciary creates (and rescinds) *per se* rules based on its own "evolv[ing]" determinations of the economic effects of certain conduct, as opposed to based on a "static" determination of what specific conduct that Congress originally intended to outlaw. *Leegin I*, 551 U.S. at 888-900. But criminal offenses must have "static" definitions; the elements cannot change based on judicial policy decisions.

52

Third, *per se* rules were created primarily for litigation and judicial efficiency and business certainty, not as interpretations of the statute. *See Maricopa Cnty.*, 457 U.S. at 344. These rules are "*the product of* judicial interpretation," *FTC v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 412 (1990) (emphasis added), in the sense that they apply when a court believes that their application serves the purpose of the statute. But the fact that a court believes that juries will invariably find that certain conduct is unreasonable does not authorize the court to rewrite the statute or to deprive the defendant of the right to present a defense as to reasonableness or *mens rea*.

Even if *per se* rules change the elements of the offense, as the government urges, those elements do not constitute an offense created by Congress; therefore, Mr. Brewbaker's conviction is for a non-existent offense. For, "[i]f Congress has not declared an act done … to be a crime …, the courts have no power to treat it as such." *United States v. Reese*, 92 U.S. 214, 216 (1875) (citing *Hudson*, 11 U.S. at 32); *accord Liparota*, 471 U.S. at 424; *Bishop*, 740 F.3d at 933.

53

## II.  SECTION 1 IS UNCONSTITUTIONALLY VAGUE AS APPLIED.

### A.  Section 1 is unconstitutionally vague as applied to this and any criminal prosecution because it literally criminalizes all economic activity and leaves it to law enforcement, judges, and juries to decide what conduct is criminal.

The vagueness doctrine accomplishes two purposes: (1) ensuring fair notice to defendants of what conduct is criminal; and, "more important[ly]," (2) protecting against arbitrary enforcement of criminal statutes by prohibiting delegation of "basic policy matters" to law enforcement, courts, and juries. *Kolender*, 461 U.S. at 358.  For

> "[i]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."

*Id.* at 358 n.7 (1983) (quoting *Reese*, 92 U.S. at 221); *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1228 (2018) (Gorsuch, J., concurring in part) ("Hamilton warned, while 'liberty can have nothing to fear from the judiciary alone,' it has 'every thing to fear from" the union of the judicial and legislative powers.'" (quoting The Federalist No. 78, at 466)).

Section 1 is unconstitutionally vague as applied to criminal prosecutions because the statute "set a net large enough to catch all possible offenders, and le[ft] it to the court to step inside and say who

could rightfully be detained, and who should be set at large." *Kolender*, 461 U.S. at 358 n.7. The statutory text literally criminalizes every contract. *E.g.*, *Standard Oil*, 221 U.S. at 63. "In consequence of the vagueness of its language …, the courts have been left to give content to [§ 1]." *Apex Hosiery*, 310 U.S. at 489. "[T]he Sherman Act's prohibition on restraint[s] of trade evolve[s] to meet the dynamics of present economic conditions," and this evolution is accomplished through a "case-by-case adjudication" process akin to the "common-law approach." *Leegin I*, 551 U.S. at 899. "But the notion of a common-law crime is utterly anathema today …." *Sorich v. United States*, 555 U.S. 1204 (2009) (Scalia, J., dissenting from denial of certiorari). Federal courts cannot make up the law. *See, e.g., Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020). And federal courts have never had authority to use the common-law approach to substantively define crimes. *See Hudson*, 11 U.S. at 34.

Judicial efforts "to establish a standard of their own to be used as a basis to render the section possible of execution" also evidence a statute's vagueness. *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 90–91 (1921). The establishment of, and consistent modifications of, the *per se* rules provide such evidence. *Cf.* Kovacic, *supra* at 49.

55

Ultimately, with § 1 Congress "set a net large enough to catch all possible offenders, and le[ft] it to the courts to step inside and say who could be rightfully detained." *Kolender*, 461 U.S. at 358 n.7. The statute is, therefore, unconstitutionally vague as applied to this (and all) criminal prosecutions.

**B.    There are insufficient statutory standards regarding what constitutes a *per se* bid rigging violation.**

The term "'bid rigging' … appears to have had a reasonably settled meaning at the time the guidelines were promulgated"; it meant "bid rotation." *United States v. Heffernan*, 43 F.3d 1144, 1146-47 (7th Cir. 1994). And courts agree that bid rigging is a subset of price fixing. *See Fenzl*, 670 F.3d at 780; *Gosselin World-Wide Moving, N.V.*, 411 F.3d at 508. Indeed, it is because bid rigging is a subset of price fixing that courts have applied the *per se* rule to bid-rigging cases. *See Fenzl*, 670 F.3d at 780.

The Indictment alleged neither bid rotation nor naked horizontal price fixing. *See* JA44-62; section I.B, above.

In "a standard bid rotation case," *Heffernan*, 43 F.3d at 1146, this Court eschewed the settled meaning of the term and defined bid rigging as "any agreement between competitors pursuant to which contract offers

56

are to be submitted to or withheld from a third party." *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 325 (4th Cir. 1982). This definition is essentially coterminous with price fixing. But this definition was announced at a time when all price fixing—whether vertical or horizontal—was *per se* unreasonable. *See Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911), *overruled by Leegin I*, 551 U.S. 877. Following *Leegin I*, only horizontal price fixing is *per se* unreasonable. 551 U.S. at 899. Yet, the district court continued to use the blanket ban on price fixing announced in *Portsmouth Paving* as the definition for the bid rigging. JA971, JA1662.

Ultimately, the statute provides no guidance about what constitutes bid rigging, and the case law is not only unclear on this point; it is in conflict. *Compare Portsmouth Paving*, 694 F.2d at 325, *with Leegin I*, 551 U.S. at 899. This lack of a settled meaning establishes that a "bid rigging" charge lacks a sufficiently settled meaning to provide fair notice and avoid arbitrary enforcement. Accordingly, § 1 is unconstitutionally vague as applied to this alleged bid rigging prosecution.

Additionally, the district court decided that a *per se* Sherman Act violation was a separate offense from a rule of reason violation. *See* JA968. But this purported offense is unconstitutionally vague (1) because there are a lack of objective measures for deciding what conduct warrants *per se* treatment; and (2) because the so-called *per se* offenses are products of judicial law-making.

First, if a *per se* Sherman Act crime is a different offense (with different elements) than a rule of reason charge, then the definition of this offense must have a sufficiently settled meaning. But "there is often no bright line separating *per se* from Rule of Reason analysis, since considerable inquiry into market conditions may be required before the application of any so-called 'per se' condemnation is justified." *Cal. Dental*, 526 U.S. at 779–80 (internal quotation marks omitted). Ultimately, "the quality of proof required [to determine whether to apply the *per se* rule] var[ies] with the circumstances." *Id.* (quoting Phillip Areeda, Antitrust Law ¶ 1507, p. 402 (1986)). This type of case-by-case determination of whether allegations support a charge violates the vagueness doctrine.

Second, if a *per se* Sherman Act offense is a separate offense from a rule of reason offense, then the *per se* charge is an unconstitutionally vague application of the Sherman Act, because that "offense" was created by the Judiciary, not by Congress. "The void-for-vagueness doctrine … is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." *Dimaya*, 138 S. Ct. at 1212. Therefore, utilizing a court-created offense under the label of a statute constitutes an unconstitutionally vague application of that statute.

### C.    Section 1 is unconstitutional as applied to conduct that enhanced competition.

"[T]he essential inquiry" for a Sherman Act case is "whether or not the challenged restraint enhances competition." *Cal. Dental*, 526 U.S. at 779–80 (quoting *NCAA*, 468 U.S. at 104 & n.26). The *per se* rules exist primarily for litigation efficiency and are recognized to be imperfect. *Maricopa Cnty.*, 457 U.S. at 344. It may be constitutional to saddle someone with a civil judgment for alleged anticompetitive conduct when full analysis would have revealed that the conduct was procompetitive; but it is an unconstitutionally vague application of § 1 to convict and imprison a citizen for conduct that did not, as a matter of fact, undermine

competition. *Cf. United States v. Robel*, 389 U.S. 258, 275 (1967) (Brennan, J., concurring) ("[T]he numerous deficiencies connected with vague legislative directives … are far more serious when liberty … [is] at stake."). Here, the only record evidence related to the effect on competition of the alleged restraint is that the restraint *enhanced* competition. *See* JA102-588. Therefore, this prosecution is an unconstitutionally vague application of § 1.

### D. *Nash* does not control.

In *Nash*, 229 U.S. at 376-78, the Court upheld Sections 1 and 2 of the Sherman Act against a constitutional challenge to its use for criminal prosecution. However, *Nash* does not control for at least five reasons.

First, *Nash* did not answer whether § 1 is unconstitutionally vague under the non-delegation prohibition of the modern vagueness test. The question presented in *Nash* under the general heading of "vague[ness]" was whether the statute was unconstitutional because it "contains in its definition an element of degree as to which estimates may differ, with the result that a man might find himself in prison because his honest judgment did not anticipate that of a jury of less competent men." *Id*. at 376. Thus, *Nash* only addressed the less important aspect of the

vagueness test—fair warning; it did not find that § 1 passed the "more important" non-delegation prong of the test, *Kolender*, 461 U.S. at 358.

Second, the *Nash* Court incorrectly assumed that courts would be able to determine the meaning of the vague term "restraint of trade" by reference to its common law meaning. *Nash*, 229 U.S. at 377. But the Court has rejected reliance on the "static" common law *meaning* of the term, opting instead to adopt the common law *approach* when deciding what § 1 means. *See Leegin I*, 551 U.S. at 899; *see id.* at 888.

Third, because § 1 has been deemed an "evolving" common law statute, *id.* at 900, the substance of § 1 today is considerably different than § 1 in 1913. Therefore, *Nash* does not control because it addressed a substantively different statute.

Fourth, *Nash* did not address whether § 1 is unconstitutionally vague as applied to a *per se* criminal prosecution.

Finally, *Nash* has no application to the questions of whether the definition of bid rigging is unconstitutionally vague, or of whether it is an unconstitutionally vague application of § 1 to use it to criminalize competition-enhancing conduct.

Therefore, *Nash* does not control this Court's determination of the instant vagueness challenge.

## III. THE COURT DIRECTED VERDICT ON TWO ESSENTIAL ELEMENTS OF THE § 1 OFFENSE.

The omission of an element of the offense from the jury instructions is reversible error unless the government establishes that the omission was harmless beyond a reasonable doubt. *See Neder v. United States*, 527 U.S. 1, 10, 16 (1999). As noted, both unreasonableness and criminal intent are elements of a § 1 offense. These elements were taken from the jury by operation of the *per* se rule. Because the jury did not find each element of the offense of § 1, the conviction is invalid under the Fifth and Sixth Amendments. This failure to instruct the jury on these essential elements was not harmless beyond a reasonable doubt because the record shows that Mr. Brewbaker was prepared to present a substantial factual defense to the elements of unreasonableness and knowledge of anticompetitive effect. *See* JA102-588. Accordingly, Mr. Brewbaker's § 1 conviction must be vacated.[2]

---

[2] If plain error review applies, the plain error test is met because failure to instruct on a required element constitutes plain error as long as it was prejudicial. *See United States v. Rogers*, 18 F.3d 265, 267 (4th Cir. 1994).

## IV. THE MAIL AND WIRE FRAUD CONVICTIONS MUST BE VACATED.

Unless the Court is "confident that the erroneous instruction[s] on [the § 1 offense] did not play any role in the jury's verdict" on the fraud counts, the fraud counts must be vacated, *Lindberg*, 39 F.4th at 164 (quoting *Connecticut v. Johnson*, 460 U.S. 73, 87 (1983)) (original alteration omitted). Here, the erroneous application of the *per se* rule "infected" the jury's consideration of the fraud counts. *Id*.

As the district court determined, the evidence was that "fraud was [designed to] conceal[] the bid-rigging." JA2677-2678. A jury that was able to consider Mr. Brewbaker's procompetitive justification and a *mens rea* defense as to the bid rigging charge may well have found that no bid rigging occurred and that there was, therefore, nothing to cover up.

The § 1 jury instructions also infected the jury's consideration of the fraud counts. The court instructed the jury to consider the erroneous *per se* rule instructions when it considered the fraud charges, following the jury's request for a definition of the term "collusion." In response to that request, the district court instructed the jury to "consider all of the facts and circumstances in evidence … and consider all of the [c]ourt's instructions as a whole" in reaching the jury's interpretation of that term.

63

JA2645.  And those other instructions included the *per se* instructions that the alleged agreement was "always illegal" and equated bid rigging with "collusion."  JA2597-2598 ("If the conspiracy charged in Count One … is proved, it is no defense … that the conspirators did not attempt to *collude* with all of their competitors." (emphasis added)).  The jury was also instructed that intent may be inferred from "all … other facts and circumstances received in evidence" and need "not … be proved directly," JA2584-2585, and the other circumstances erroneously included an instruction that the alleged agreement was criminal as a matter of law and erroneously did not include evidence that the bidding conduct was procompetitive.

Therefore, the § 1 errors prejudiced the jury's consideration of the fraud charges, and the fraud charges must be vacated as well.

## CONCLUSION

For the foregoing reasons, the Court should vacate each of the judgments of conviction and the sentence and remand for a new trial on all counts.

64

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Brewbaker respectfully requests oral argument. This appeal arises from a jury trial and presents several complex and important issues of first impression, including whether, following the Supreme Court's decision in *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), this Court will hold, consistent with each of the nine circuits to consider the question, that dual distribution arrangements warrant rule of reason treatment. This case also involves complicated economic analysis, as well as district court uncertainty regarding what procedure to follow when deciding between rule of reason and *per se* rule analysis when faced with a plausible procompetitive justification. Mr. Brewbaker believes that oral argument will help the Court understand and decide the issues presented.

Respectfully submitted,

/s/ Elliot S. Abrams
Elliot S. Abrams
CHESHIRE, PARKER,
  SCHNEIDER, PLLC
133 Fayetteville Street
Suite 400
Raleigh, NC 27601
(919) 833-3114
elliot.abrams@cheshirepark.com

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

         this document contains <u>12,981</u> words.

2.      This document complies with the typeface requirements because: This document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14-point Century Schoolbook</u>.

Dated: February 14, 2023         Respectfully submitted,

                     <u>/s/ Elliot S. Abrams</u>
                     Elliot S. Abrams
                     CHESHIRE, PARKER,
                       SCHNEIDER, PLLC
                     133 Fayetteville Street
                     Suite 400
                     Raleigh, NC 27601
                     (919) 833-3114
                     elliot.abrams@cheshirepark.com

                     *Counsel for Appellant*

66